IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

AMERICA SCIENCE TEAM
RICHMOND, INC.,
Plaintiff,

v.                                                          Civil Action No. 3:22cv451

ENOCH CHAN,
Defendant.

## OPINION

Enoch Chan allegedly misappropriated tens of thousands of files containing the trade secrets of his former employer, America Science Team Richmond, Inc. ("AmeriSci"). From this conduct, AmeriSci has brought nine federal and state claims against Chan. Chan denies that he misappropriated any trade secrets and has raised counterclaims against AmeriSci for allegedly violating federal human trafficking laws.

Both parties now move to dismiss each other's respective complaints for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Chan also moves to supplement the record with a Chinese-to-English translation of an exhibit he attached to his counterclaim complaint. Because the translation aids the Court in assessing Chan's counterclaims, the Court will grant the motion to supplement. The Court will grant AmeriSci's motion to dismiss Chan's counterclaims, however, as he has not plausibly alleged that AmeriSci violated any trafficking laws. Furthermore, the Court will grant in part and deny in part Chan's motion to dismiss. AmeriSci has not sufficiently presented a claim under the federal Shared Communications Act, and the Virginia Uniform Trade Secrets Act preempts the company's common law claims for conversion and trespass to chattels. AmeriSci's six remaining claims will otherwise survive.

# I. **BACKGROUND**

## *A. Factual Allegations*

### *1. AmeriSci's Allegations*

"AmeriSci provides analytical testing of mold, bacteria, lead, and asbestos for environmental professionals across the country." (ECF No. 1 ¶ 13.) In 2016, Chan began working for an AmeriSci affiliate in New York. He later moved to the company's Richmond, Virginia, location in 2019. As part of his employment arrangement, Chan signed a confidentiality agreement in which he agreed (1) to not disclose, communicate, or divulge any of AmeriSci's confidential information and (2) to return all of AmeriSci's property, including all confidential information in his possession, at the end of his employment. In addition to this agreement, Chan consented to AmeriSci's policies, which forbade employees from "us[ing] a password, access[ing] a file, or retriev[ing] any stored communication without authorization." (*Id.* ¶ 25 (emphasis removed).) The policies also required employees to obtain approval from the network manager before installing software; identified the theft or inappropriate removal or possession of property, unauthorized use of employer-owned equipment, and unauthorized disclosure of confidential information as infractions of AmeriSci's rules of conduct; and prohibited employees from violating the policies and committing a fraudulent act or breach of trust.

In violation of his employment agreement and AmeriSci's policies, Chan copied over 70,000 files containing AmeriSci's trade secrets and confidential information from a shared folder to his virtual machine[1] without authorization on November 14, 2019. All but one of the files—

---

[1] "A virtual machine is an emulation of a computer system that allows a user to utilize the data and power of a centralized server via an application window on the user's desktop." (ECF No. 1 ¶ 20.) "The software allows a user to access all of their data through a secure system using any computer." (*Id.*)

2

which included human resources documents, marketing materials, purchase orders, standard operating procedures, and proprietary protocols—had no relation to Chan's job duties.  Later that day, Chan downloaded and installed an unauthorized virtual private network ("VPN") to his virtual machine and transferred the files "out of the building without detection." (*Id.* ¶ 40.) He went on family medical leave five days later and never returned to work.

AmeriSci ultimately discovered Chan's misappropriation on January 1, 2020.  Later that year, Chan's legal authorization to work in the United States expired.  Between this and the company's belief that Chan had stolen its trade secrets, AmeriSci terminated Chan's employment on August 21, 2020.  Chan has since continued to use and misappropriate AmeriSci's trade secrets and confidential information, which exposes the company to the risk that Chan or others may open a competing laboratory that offers the same or similar services with little effort.

### 2. *Chan's Allegations*

Around the time Chan began working for AmeriSci's New York affiliate, he separately secured the services of Elaine Chang, an attorney, to help him through the process of applying for an employment-based immigrant visa.  This included filing a Program Electronic Review Management ("PERM") labor certification application with the Department of Labor ("DOL"), followed by a permanent work authorization petition, known as "Form I-140," and a permanent resident application, known as "Form I-485," with the Department of Homeland Security's United States Citizenship and Immigration Services ("USCIS").[2]  Unbeknownst to Chan, Chang also worked as a senior vice president and general counsel for AmeriSci at the time.

_____

[2] "In most instances, before [a] U.S. employer can submit an immigration petition to [USCIS], the employer must obtain a certified labor certification application from [DOL]." *Permanent Labor Certification*, U.S. Dep't of Labor, Emp. & Training Admin., https://www.dol.gov/agencies/eta/foreign-labor/programs/permanent (last visited June 26, 2025). "DOL must certify to . . . USCIS that there are not sufficient U.S. workers able, willing, qualified[,]

Although DOL approved Chan's first PERM application in 2017, Chang subsequently filed the wrong version of the Form I-140, which forced Chan to restart the visa process. By that date, obtaining an employment-based immigrant visa in New York had become challenging due to the high number of applicants in the area, so Chang recommended that Chan move to Richmond, Virginia, instead. Chan agreed and was transferred to AmeriSci's Richmond location in June 2019. Chang then submitted Chan's new PERM application, which DOL approved, and thereafter filed his Form I-140 and Form I-485 with USCIS.

In May 2020, USCIS asked Chan to supplement his Form I-485 with a confirmation of a bona fide job offer from his employer. This confirmation is known as "Supplement J." In July 2020, Chang informed Chan's mother that AmeriSci had signed Supplement J but would not return it unless his parents paid the company a substantial sum of money. AmeriSci used Chan's alleged misappropriation of trade secrets as a pretext for making this demand. Chang also personally insisted on additional payment for legal fees connected to Chan's PERM application around this time, yet she never informed Chan that he could seek a job with a different employer who might sponsor his visa application. Having already paid substantial legal fees throughout his years-long immigration process, and viewing AmeriSci's and Chang's threats as extortion attempts, Chan refused to make the requested payments, all while continuing to deny that he stole any trade secrets.

---

and available to accept the job opportunity in the area of intended employment and that employment of the foreign worker will not adversely affect the wages and working conditions of similarly employed U.S. workers." *Id.* Once DOL approves the PERM application, the prospective employer or foreign national may submit Form I-140 to petition USCIS to allow the foreign national to permanently work in the United States. *See* U.S. Citizenship & Immigr. Servs., Form I-140, Instructions for Petition for Alien Workers (2024). The foreign national may also submit Form I-485 "to apply for lawful permanent resident status" in the United States. *See* U.S. Citizenship & Immigr. Servs., Form I-485, Instructions for Application to Register Permanent Residence or Adjust Status (2025).

On August 11, 2021, USCIS denied Chan's visa application due to AmeriSci's refusal to provide Chan with Supplement J. This ultimately forced Chan to leave the United States.

### B. *Relevant Procedural History*

On June 22, 2022, AmeriSci initiated this action against Chan, raising claims for breach of contract (Claim 1); breach of fiduciary duty (Claim 2); misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act (Claim 3); conversion (Claim 4); violation of the Virginia Computer Crimes Act (Claim 5); violation of the Computer Fraud and Abuse Act (Claim 6); misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 (Claim 7); unlawful access to stored communications under the Stored Communications Act (Claim 8); and trespass to chattels (Claim 9). Although AmeriSci purportedly served Chan with the summons and complaint, Chan never filed a response. This prompted the Clerk to enter default against Chan on November 22, 2022, and the Court to enter default judgment against Chan on April 4, 2023.

On March 11, 2024, Chan moved to set aside the entry of default and default judgment on the ground that he never received service of process. After the parties briefed the matter, the Court conducted a hearing on December 12, 2024. At the Court's direction, Chan subsequently submitted additional evidence showing that he did not receive service of the summons and the complaint. The totality of the evidence ultimately led the Court to grant Chan's motion to set aside the entry of default and default judgment on March 12, 2025.

On April 1, 2025, Chan filed a document that he marked on the docket as both an answer to AmeriSci's complaint and a counterclaim complaint. (*See* ECF No. 43.) The next day, he filed another document notated as a motion to dismiss for failure to state a claim. (*See* ECF No. 44.) Despite their different classifications, both documents are identical in substance and contain three sections. The first section represents Chan's answer to AmeriSci's complaint, in which he largely

denies the allegations against him and asserts various defenses, including failure to state a claim. Chan styles the second section as a motion to dismiss all nine of AmeriSci's claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). This section consists of just seven numbered paragraphs, each one sentence in length. The last of these paragraphs states Chan's intent to file a supporting memorandum to this motion, though he never did so. The third section amounts to a counterclaim complaint against AmeriSci for forced labor, in violation of 18 U.S.C. § 1589, and document servitude, in violation of 18 U.S.C. §§ 1592 and 1597. In support of his counterclaims, Chan included as an exhibit a communication made in Chinese between his mother and Chang. He later moved to supplement the record with an English translation of that communication. On April 16, 2025, AmeriSci similarly moved to dismiss Chan's counterclaims for failure to state a claim.

## II. <u>DISCUSSION</u>[3]

### A. *Chan's Motion to Dismiss AmeriSci's Claims*

#### 1. *Procedural Deficiencies*

AmeriSci contends that Chan's motion to dismiss, which he embeds in a document that also contains his answer to AmeriSci's complaint and his own counterclaim complaint, arguably violates the Federal Rules of Civil Procedure and certainly violates the Local Civil Rules of the Eastern District of Virginia. Under Federal Rule of Civil Procedure 12(b), "[a] motion asserting

---

[3] To survive a motion to dismiss under Rule 12(b)(6) or a motion for judgment on the pleadings under Rule 12(c), a plaintiff must present sufficient facts to state a facially plausible claim for relief. *See Short v. Harman*, 87 F.4th 593, 603 (4th Cir. 2023). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Courts must accept as true the complaint's factual allegations and draw all reasonable inferences in favor of the non-moving party, but need not accept the veracity of conclusions or threadbare recitals of the cause of action's elements. *Id.*; *Iqbal*, 556 U.S. at 678.

[failure to state a claim] must be made before pleading if a responsive pleading is allowed." According to AmeriSci, Chan debatably waived his defense of failure to state a claim because he filed a document notated as his motion to dismiss on April 2, 2025, the day after filing a document he marked as his answer to the complaint. The April 2 document, however, is identical in substance to that filed on April 1. In any event, by answering the complaint before moving to dismiss it, Chan has effectively submitted "a Rule 12(c) motion for judgment on the pleadings raising the defense of failure to state claim upon which relief can be granted." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Because courts apply the same standard in considering Rule 12(b)(6) and Rule 12(c) motions, "viewing [Chan's] motion as a Rule 12(c) motion does not have a practical effect" on the Court's review, and the Court may still consider his motion. *Id.*

Chan's motion nevertheless violates this Court's local civil rules. Chan asserts that he did not need to submit "a separate memorandum" to his motion because "the entire request and support is contained in the motion body." (ECF No. 47, at 1.) He further posits that had the header to the second section of his April 1, 2025, filing read "Motion and Memorandum in Support," he would have complied with this Court's rules. In Chan's eyes, "such mere technicality and hyper formalism should not carry the day." (*Id.* at 1–2.) Technicalities may not be the essence of life, but they are the essence of the law. Except in circumstances not present here, this Court requires parties to accompany "all motions" with "a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies." E.D. Va. Loc. Civ. R. 7(F)(1); *see* E.D. Va. Loc. Civ. R. 7(F)(2). Chan violated this rule not only by failing to submit a brief in support of his motion to dismiss, but also by citing to no authorities whatsoever to support his request. Chan's motion is also concise to a fault. In just seven sentences, he asks the Court to dismiss AmeriSci's nine claims based on his mistaken belief that the company

7

failed to allege that he moved any files outside of AmeriSci's secure system—even though that allegation has no bearing on determining the validity of many of AmeriSci's claims. In these circumstances, the Court seriously doubts that Chan's attorney made reasonable inquiry into the grounds for raising the motion to dismiss. *See* Fed. R. Civ. P. 11(b). While the Court will still consider Chan's motion, any future filings that violate this Court's rules or the Federal Rules of Civil Procedure may result in the imposition of sanctions pursuant to Federal Rule of Civil Procedure 11(c). This includes the denial of any motion that is embedded within a larger document, has no supporting brief, cites to no authorities, or contains unparticularized arguments, as well as the award of attorney's fees and fines.

### 2. *Substantive Claims*

#### a. *Claim 1: Breach of Contract*

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 344 (Va. 2016) (quoting *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006)) (internal quotation marks and brackets omitted). AmeriSci alleges that Chan owed the company various legally enforceable obligations through his confidentiality agreement and his agreement to abide by AmeriSci's policies. Under both the confidentiality agreement and the company's policies, Chan agreed to not disclose, communicate, or divulge any of AmeriSci's confidential information. Although AmeriSci alleges that "Chan is using or intends to use" the company's trade secrets, (ECF No. 1 ¶ 44), the company has not stated that Chan breached his duty of confidentiality by actually disclosing any trade secrets or communicating them to others. AmeriSci's breach of contract claim thus fails under this theory.

8

The confidentiality agreement nevertheless required Chan to return all of AmeriSci's property, including all confidential information in his possession, at the end of his employment. AmeriSci's allegation that Chan "is using or intends to use" the company's trade secrets indicates that Chan failed to return these files at the end of his employment, in violation of the confidentiality agreement.  (*Id.*)  Moreover, Chan allegedly violated several company policies to which he consented by accessing over 70,000 files without authorization, installing a VPN without approval, inappropriately removing the company's trade secrets, engaging in unauthorized use of AmeriSci's equipment, and committing a fraudulent act or breach of trust.  According to AmeriSci, these acts have exposed the company to the risk of Chan or others opening a competing laboratory using AmeriSci's trade secrets and have caused or will continue to cause the company damages totaling at least $500,000.  Thus, AmeriSci has plausibly stated a breach of contract claim on these grounds.

### b.  Claim 2: Breach of Fiduciary Duty

"Under Virginia law, the elements of a breach of fiduciary duty claim are: (1) the defendant owes a fiduciary duty, (2) the defendant breached that fiduciary duty, and (3) the breach of fiduciary duty resulted in damages." *Plumbers & Steamfitters Union Loc. No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020).  The Virginia Supreme Court has "long recognized that under the common law an employee, including an employee-at-will, owes a fiduciary duty of loyalty to his employer during his employment." *Williams v. Dominion Tech. Partners, L.L.C.*, 576 S.E.2d 752, 757 (Va. 2003).  Misappropriating trade secrets or misusing confidential information "clearly constitute a breach of the duty of loyalty [an employee] owes to his employer." *Id.* at 758.

AmeriSci alleges that Chan, as its employee, owed the company a fiduciary duty of loyalty; that Chan breached this duty by misappropriating AmeriSci's trade secrets and confidential

information; and that the company has suffered and will continue to suffer damage both monetarily and from the risk that Chan or others may open a competing laboratory. Having easily satisfied the requisite elements, AmeriSci may proceed with its breach of fiduciary duty claim.

### c. Claims 3 & 7: Misappropriation of Trade Secrets

AmeriSci alleges that Chan's misappropriation of the company's trade secrets violated both the Virginia Uniform Trade Secrets Act ("VUTSA") and the Defend Trade Secrets Act of 2016 ("DTSA"). Establishing a VUTSA violation requires showing (1) that a trade secret existed and (2) that the defendant misappropriated that trade secret. *See Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 769 (4th Cir. 2023) (citing *MicroStrategy Inc. v. Li*, 601 S.E.2d 580, 588 (Va. 2004)). Similarly, to prevail on a DTSA claim, a plaintiff must establish "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *See dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 141 (4th Cir. 2023).

Trade secrets consist of any financial, business, scientific, technical, economic, or engineering information (1) that derives independent economic value from its secrecy and (2) that its owner has taken reasonable measures to keep secret. *Synopsys*, 70 F.4th at 769; *see* 18 U.S.C. § 1839(3)(A)–(B); Va. Code. § 59.1-336. According to the complaint, AmeriSci maintains financial information, marketing strategies, human resources documents, and scientific and technological data and spent years developing proprietary protocols for its laboratory systems. This information enables AmeriSci "to compete with other laboratories" and "maintain a marketing advantage." (ECF No. 1 ¶ 17.) AmeriSci keeps this information confidential by restricting access only to employees and by having employees like Chan sign confidentiality agreements. Based on these allegations, AmeriSci has sufficiently stated that it owns trade secrets.

Both the VUTSA and the DTSA further require alleging that the defendant misappropriated the plaintiff's trade secrets. *See Synopsys*, 70 F.4th at 769; *dmarcian*, 60 F.4th at 141. "[T]o prove misappropriation, the plaintiff must establish two elements." *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 855 (E.D. Va. 2018); *see id.* at 854. First, the defendant must have "acquired, disclosed, or used a trade secret developed by the plaintiff through improper means (namely, without express or implied consent)." *Id.*; *see id.* at 854. Second, the defendant must have known or had reason to know "that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff." *Id.* at 855; *see id.* at 854. Here, AmeriSci alleges that Chan took the company's trade secrets by copying the files to his virtual machine without authorization and installing an unauthorized VPN that enabled him to transfer the files offsite. Given his confidentiality agreement and consent to AmeriSci's policies, Chan had reason to know that he had a duty to maintain the secrecy of these files. Thus, AmeriSci has adequately pleaded the second elements of both the VUTSA and the DTSA.

Lastly, the trade secrets that Chan allegedly stole include financial information, marketing strategies, human resources documents, scientific and technological data, and proprietary protocols that AmeriSci uses in providing laboratory testing services to environmental professionals across the country. This suffices to satisfy the DTSA's interstate commerce element at this stage of the proceedings. *See Space Sys.*, 306 F. Supp. 3d at 854–55. AmeriSci's VUTSA and DTSA claims, therefore, both survive.

### d. Claim 4: Conversion

"Conversion is the 'wrongful exercise or assumption of authority . . . over another's goods[.]'" *United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 670 (4th Cir. 1996)

(quoting *United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 905 (Va. 1994)).   As discussed, AmeriSci has sufficiently pleaded that Chan wrongfully exercised control over its trade secrets and confidential information.   *See supra* Section II.A.2.c.   Yet, the VUTSA contains a preemption provision which provides that "this chapter displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret."   Va. Code. § 59.1-341(A).   The preemption provision works "to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret."   *Space Sys.*, 306 F. Supp. at 856 (quoting *Smithfield Ham & Prods. Co. v. Portion Pac, Inc.*, 905 F. Supp. 3d 346, 348 (E.D. Va. 1995)). Thus, the VUTSA will preempt AmeriSci's conversion claim if the latter is "predicated 'entirely' on [Chan's] alleged misappropriation of trade secrets."   *Id.*

AmeriSci's pleadings make clear that the company has premised its conversion claim "entirely on an alleged misappropriation of trade secrets."   *Id.*   According to the complaint, "[a]ll of the information [that Chan] copied consisted of AmeriSci's confidential and proprietary [t]rade [s]ecrets."   (ECF No. 1 ¶ 43.)   And in raising its conversion claim, AmeriSci alleges that the company's "confidential information is the exclusive property of AmeriSci," and that "[d]espite demand, AmeriSci has been unable to access or recover its confidential information being used by Chan."   (*Id.* ¶¶ 64–65.)   Because AmeriSci offers no alternative theory other than Chan's alleged misappropriation of trade secrets, the VUTSA preempts the company's conversion claim.

### e.  Claim 5: Virginia Computer Crimes Act

The Virginia Computer Crimes Act ("VCCA"), though primarily a criminal statute, provides a civil remedy for "[a]ny person whose property . . . is injured by reasons of a violation of [the VCCA]."   Va. Code § 18.2-152.12(A).   The VCCA forbids "any person, with malicious

intent, or through intentionally deceptive means and without authority," from "[using] a computer or computer network to make or cause to be made an unauthorized copy[] . . . of computer data[] . . . residing in, communicated by, or produced by a computer or computer network." Va. Code § 18.2-152.4(A)(6). AmeriSci easily makes out a claim under § 18.2-152.4(A)(6), as the company alleges that "Chan willfully and maliciously used AmeriSci's computers, computer programs, and devices to make unauthorized copies of AmeriSci's confidential information and [t]rade [s]ecrets" housed in an internal shared folder. (ECF No. 1 ¶ 72; *see id.* ¶ 39.) Accordingly, AmeriSci may proceed with its VCCA claim.

### f.  Claim 6:  Computer Fraud and Abuse Act

Like the VCCA, the federal Computer Fraud and Abuse Act ("CFAA") ordinarily operates as a criminal statute but also provides a private right of action for "[a]ny person who suffers damage or loss" from certain conduct enumerated under the statute. 18 U.S.C. § 1030(g). This includes instances where one "(1) intentionally (2) accessed a computer (3) without authorization or in such a way that exceeded his authorized access, and (4) obtained information (5) from any 'protected computer,' (6) resulting in a loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 922–23 (E.D. Va. 2017) (quoting 18 U.S.C. § 1030(a)(2)(C)); *see* 18 U.S.C. § 1030(c)(4)(A)(i)(I).[4]

---

[4] One exceeds his authorized access when he "access[es] a computer with authorization and . . . use[s] such access to obtain . . . information in the computer that the accesser is not entitled so to obtain." 18 U.S.C. § 1030(e)(6). Moreover, a "protected computer" is a computer "which is used in or affecting interstate or foreign commerce or communication." *Id.* § 1030(e)(2)(B). "Several courts have held that 'any computer with Internet access' is a 'protected computer' and, thus, is 'a subject of the [CFAA's] protection." *Cuellar*, 239 F. Supp. 3d at 926 (alteration in original) (collecting cases).

According to the complaint, Chan used his virtual machine to intentionally access over 70,000 files of trade secrets and transfer the data offsite using an unauthorized VPN. Chan allegedly needed just one of these files to perform his job, indicating that he exceeded the scope of his authority in accessing these files. The virtual machine also "allows a user to access all of their data through a secure system using any computer," demonstrating its protected nature. (ECF No. 1 ¶ 20.) Finally, AmeriSci values the stolen information, which Chan allegedly took on a single day, at over $500,000. Thus, AmeriSci has plausibly stated a CFAA claim.

### g. Claim 8: Stored Communications Act

The Stored Communications Act ("SCA"), like the VCCA and CFAA, provides a civil remedy for those affected by a knowing or intentional violation of the statute. *See* 18 U.S.C. § 2707(a). AmeriSci alleges a violation of 18 U.S.C. § 2701(a), which forbids "intentionally access[ing] without authorization a facility through which an electronic communication service is provided[] . . . and thereby obtain[ing], alter[ing], or prevent[ing] authorized access to a wire or electronic communication while it is in electronic storage in such system." AmeriSci fails to adequately plead a violation of this statute in multiple respects.

First, AmeriSci has not alleged that Chan accessed a "facility" within the meaning of the statute. Although the SCA leaves "facility" undefined, courts across the country have consistently held that "[t]he relevant 'facilities' that the SCA is designed to protect are not computers that *enable* the use of an electronic communication service, but instead are facilities that are *operated* by electronic communication service providers and used to store and maintain electronic storage." *Garcia v. City of Laredo*, 702 F.3d 788, 792 (5th Cir. 2012) (emphasis in original); *see, e.g.*, *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 146 (3d Cir. 2015); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 821–22 (N.D. Cal. 2020). This includes the

14

Fourth Circuit, which has recognized that Congress enacted the SCA to protect those who "have a legitimate interest in the confidentiality of communications in electronic storage at a *communications facility*." *Hately v. Watts*, 917 F.3d 770, 783 (4th Cir. 2019) (emphasis added) (quoting *Theofel v. Farey-Jones*, 359 F.3d 1066, 1072 (9th Cir. 2004)). Rather than accessing a communications facility, Chan instead allegedly accessed an internal shared folder on AmeriSci's computer network. Thus, AmeriSci's SCA claim fails at the first step.

Second, AmeriSci claims that Chan accessed and stole "human resources documents, marketing materials, purchase orders, and standard operating procedure documents," as well as "proprietary protocols." (ECF No. 1 ¶ 43.) None of these files appear to constitute a "wire or electronic communication" as defined in the SCA. *See* 18 U.S.C. § 2510(1) (defining "wire communication" as "any aural transfer made . . . through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection"); *id.* § 2510(12) ("electronic communication" includes any transfer of data transmitted "by a wire, radio, electromagnetic, photoelectronic[,] or photooptical system that affects interstate or foreign commerce"); *id.* § 2711(1); *Hately*, 917 F.3d at 785 (identifying emails as "a form of 'electronic communication' within the meaning of the [SCA]"). AmeriSci's SCA claim accordingly fails on this ground, too.

### h. Claim 9: Trespass to Chattels

A plaintiff generally must establish two elements to prevail on a trespass to chattels claim. The defendant first must have "intentionally use[d] or intermeddle[d] with personal property in rightful possession of another without authorization." *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d 309, 320 (E.D. Va. 2009) (quoting *Am. Online, Inc. v. LCGM, Inc.*, 46 F. Supp. 2d 444, 451–52 (E.D. Va. 1998)). From there, the defendant's unauthorized use or intermeddling must have resulted in

(1) dispossessing the other of the chattel, (2) impairing the chattel's condition, quality[,] or value, (3) depriving the possessor of the chattel for a substantial period of time, or (4) causing bodily harm to the possessor or to some person or thing with which the possessor has a legally protected interest,

*Johnson v. Westlake Flooring Co.*, 744 F. Supp. 3d 622, 631 (E.D. Va. 2024).

AmeriSci alleges that Chan "intentionally used, meddled with, and accessed AmeriSci's computer, servers, and [t]rade [s]ecrets without authorization." (ECF No. 1 ¶ 96.) At first glance, this allegation seems to place AmeriSci's trespass to chattels claim beyond the scope of the VUTSA's preemption provision because the claim arises not only out of Chan's alleged misappropriation of trade secrets, but also from his unauthorized use of AmeriSci's computers and servers. *See* Va. Code. § 59.1-341(A); *Space Sys.*, 306 F. Supp. at 856. Yet, AmeriSci does not assert that Chan's unauthorized activity dispossessed or deprived AmeriSci of its computer and servers; impaired the condition, quality, or value of the computer and servers; or caused bodily harm to anyone. Instead, the complaint indicates only that Chan's unauthorized activity impaired the value of AmeriSci's trade secrets by exposing the company to the risk that Chan or others may open a competing laboratory.[5] As a result, AmeriSci's trespass to chattels claim can only proceed on the theory that Chan misappropriated the company's trade secrets. And since the only viable theory upon which AmeriSci bases its trespass to chattels claim relates to Chan's alleged misappropriation, the VUTSA preempts this claim.

### B. Chan's Motion to Supplement

"On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the

---

[5] Because Chan allegedly "copied" the files containing AmeriSci's trade secrets, he does not appear to have dispossessed or deprived AmeriSci of its trade secrets, as AmeriSci seemingly still has access to the original versions of these files. (ECF No. 1 ¶ 43.)

date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Chan moves to supplement the record with an English translation of a communication made in Chinese between his mother and Chang.[6] Because the translation aids the Court in more effectively evaluating the viability of Chan's counterclaims, the Court will grant Chan's motion to supplement.

### C. AmeriSci's Motion to Dismiss Chan's Counterclaims

#### 1. Forced Labor

Federal law forbids compelling one into labor by means of (1) an actual or threatened abuse of law or legal process or (2) a scheme that intentionally causes a person to believe that they would suffer serious harm if they do not perform such labor, among other grounds not applicable here. *See* 18 U.S.C. § 1589(a)(3)–(4).[7] Proving a violation of this statute includes a multistep showing of culpability, including demonstrating that the defendant actually obtained the victim's labor "through one of the methods prohibited by § 1589." *United States v. Luong*, 125 F.4th 147, 154 (4th Cir. 2025).

---

[6] The linguist who performed the translation has signed a certification, rather than an affidavit, attesting to the accuracy of the translation. (*See* ECF No. 50-1, at 6.) While the Court ordinarily would demand that Chan provide a sworn affidavit from the linguist, the Court will assume—at this stage of the proceedings only—that the translation is accurate.

[7] The term "abuse of law or legal process" means "the use or threatened use of [any] administrative, civil, or criminal [law], in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1); *see United States v. Luong*, 125 F.4th 147, 154 (4th Cir. 2025). "Serious harm" covers any physical or nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2); *see Luong*, 125 F.4th at 154.

Chan's period of active employment—that is, the time during which AmeriSci obtained his labor—ran from 2016 to November 19, 2019.[8] At no point during this three-year period did Chan allegedly work under forced conditions. Chan does not claim that AmeriSci forced him to start or continue working for the company's affiliate in New York at any point in time. *See Muchira v. Al-Rawaf*, 850 F.3d 605, 623 (4th Cir. 2017) (rejecting civil forced labor claim where the plaintiff "admits that she came to the United States voluntarily"). Nor does he plausibly allege that AmeriSci compelled him to work in Richmond, as Chang merely "recommended" he move to Richmond to improve his chances of obtaining permanent residence in the United States. (ECF No. 44, at 12, ¶ 6.) And even if the Court accepts Chan's allegation that AmeriSci attempted to extort him and his family out of "substantial sums of money," the alleged extortion did not begin until July 2020. (*Id.* at 12, ¶ 9, n.2.) By that date, Chan had not actively worked for AmeriSci for over half a year, and he did not return to work thereafter. Thus, AmeriSci never obtained Chan's labor using "one of the methods prohibited by § 1589." *Luong*, 125 F.4th at 154. His forced labor counterclaim fails.

### 2. *Document Servitude*

Establishing document servitude under 18 U.S.C. § 1592 and 18 U.S.C. § 1597 involves showing, among other requirements, that AmeriSci destroyed, "concealed, removed, confiscated, or possessed an actual or purported passport or other immigration document, or any other actual or purported government identification document" of Chan's. *United States v. Aman*, No. 3:19cr85, 2022 WL 3371320, at *13 (E.D. Va. Aug. 16, 2022); *see* 18 U.S.C. § 1592(a); *id.*

---

[8] AmeriSci alleges that Chan began family medical leave on November 19, 2019, and never returned to work thereafter. (*See* ECF No. 1 ¶¶ 39, 45.) Because Chan has not denied this chronology of events, (*see* ECF No. 44, at 4–5, ¶¶ 39, 45), he has admitted it, *see* Fed. R. Civ. P. 8(b)(6).

§ 1597(a). Chan bases his document servitude claims on Supplement J. Because Supplement J plainly is not a "passport" or a "government identification document," it must qualify as an "other immigration document" for Chan's document servitude claims to survive.

"If considered in isolation, the phrase ['other immigration documents'] could embrace" any number of immigration-related documents under § 1592 and § 1597. *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). "The definition of words in isolation, however, is not necessarily controlling in statutory construction." *Id.* "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Id.*; *see Williamson v. Prime Sports Mktg., LLC*, 101 F.4th 302, 309 (4th Cir. 2024) (directing courts to examine a statute's purpose and legislative history in conducting a statutory interpretation analysis). And "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003) [hereinafter *Keffeler*] (alteration in original) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001)).

Numerous statutory interpretation methods lead the Court to conclude that the phrase "other immigration documents" refers to those immigration documents that enable one to enter and exit a country, rather than to serve as an all-encompassing phrase covering a broad swath of immigration-related documents. Both § 1592 and § 1597 exist to hold accountable those who traffic individuals and unlawfully force them to remain in their employ. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 102, 114 Stat. 1464, 1466 (2000) ("The purposes of this division are to combat trafficking in persons, a contemporary manifestation

of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."). Indeed, Congress's primary concern when enacting § 1592 pertained to the ability of traffickers to seize or destroy documents that would prevent victims from leaving the country. *See, e.g.*, H.R. Rep. No. 106-487, Part 1, at 15 (1999) ("In Chicago, traffickers met Russian and Latvian women at the airport, seized their passports and return tickets, beat them, and threatened to kill their families if the women refused to dance nude in a nightclub."); 146 Cong. Rec. H2684 (daily ed. May 9, 2000) (statement of Rep. Smith) (explaining how one trafficker told a victim, "Don't try to leave. You have no papers. You have no passport."); 146 Cong. Rec. S10164 (daily ed. Oct. 11, 2000) (statement of Sen. Brownback) (recounting how a trafficker burned a victim's passport and told her, "Don't try to leave. You have no papers . . . ."). While withholding Supplement J may prevent an employee from obtaining permanent residence in the United States, such action does not restrict the employee's liberty in such a way as to prevent him from seeking employment with another employer or leaving the country. Thus, interpreting "other immigration documents" to include Supplement J would not comport with the legislative history and intent of § 1592 and § 1597.

The structure of the text also leads to this result. In both § 1592 and § 1597, "other immigration documents" immediately follows "actual or purported passport." Section 1592 further nests the phrase between "actual or purported passport" and "any other actual or purported government identification document." Passports and other government identification documents are precisely the types of documents individuals use to enter and exit a country. *See Passport*, Black's Law Dictionary (12th ed. 2024) (defining "passport" as "[a] formal document certifying a person's identity and citizenship so that the person may travel to and from a foreign country"); *Western Hemisphere Travel Initiative*, Dep't of Homeland Sec. (May 30, 2023),

https://www.dhs.gov/western-hemisphere-travel-initiative (authorizing entry into the United States by land and sea using an Enhanced Driver's License or United States military identification card). It logically follows, then, that "other immigration documents" encompasses those documents that enable one to enter or exit a country but do not necessarily qualify as government identification documents, such as a birth certificate. *See Required Documentation*, U.S. Dep't of State, Bureau of Educ. & Cultural Affs., https://exchanges.state.gov/us/required-documentation (last visited June 20, 2025) ("Some countries may allow you to enter with only a birth certificate[] ....."). Any other outcome would result in § 1592 and § 1597 embracing certain types of immigration documents dissimilar in nature to those enunciated in the surrounding text, in contravention of United States Supreme Court guidance. *See Keffeler*, 537 U.S. at 384.

Finally, case law—while scarce on the question presented here—further supports the Court's reading. In *United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009), the Eighth Circuit upheld convictions for peonage and document servitude where the defendants "required the [victim] workers to turn over their passports and immigration documents." *Id.* at 370. In so doing, the Eighth Circuit explained that "the workers needed their passports and immigration documentation to leave the country." *Id.* at 375–76. Without them, "the workers were required to remain in the command, if not the employment, of the [defendants]." *Id.* at 376.

Similarly, in *Ramos-Madrigal v. Mendiola Forestry Service, LLC*, 799 F. Supp. 2d 958 (W.D. Ark. 2011), the plaintiffs sued their employer under § 1592 for confiscating their H–2B visa extension documents. *See id.* at 960. Although the plaintiffs remained "in possession of their passports and original H–2B visa documents," the defendants refused to provide the visa extension documents to the plaintiffs until the end of their contract and threatened the plaintiffs with serious immigration consequences if they left before the contract's end. *Id.* at 960. Without these

documents, the workers could not lawfully obtain employment elsewhere in the United States and, thus, had no way of leaving their jobs. *See id.* In these circumstances, the district court determined that the visa extension documents qualified as "other immigration documents" within the meaning of § 1592. *Id.*

In both *Farrell* and *Ramos-Madrigal*, the defendants' possession of the immigration documents at issue effectively prevented the workers in those cases from leaving their employment positions or the country. In contrast, AmeriSci's alleged refusal to return Supplement J to Chan did not inhibit him from seeking employment elsewhere or exiting the country.[9] Thus, the limited case law on this question further supports the notion that Supplement J does not qualify as an "other immigration document" within the meaning of § 1592 and § 1597.

In sum, the legislative history and intent of § 1592 and § 1597; the structure of the statutes' text; and the existing, albeit limited, case law on the question presented all support the conclusion that "other immigration documents" relate to those documents that enable one to enter and exit a country. Because Supplement J merely serves as a supplemental form to a permanent residence application and in no way relates to one's entry into or exit from a country, it does not qualify as an "other immigration document" within the meaning of § 1592 and § 1597. Chan's document servitude claims accordingly fail.

## III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Chan's motion to dismiss AmeriSci's complaint. All of AmeriSci's claims, except for Claims 4, 8, and 9, survive.

---

[9] Chang's mere alleged failure to inform Chan that he could seek employment elsewhere in no way shows that AmeriSci forced Chan to continue working there.

In addition, the Court will grant Chan's motion to supplement the record and grant AmeriSci's motion to dismiss Chan's counterclaims.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 15 Jul 2025
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

23